# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-00884-COA

JEROME DAVIS A/K/A JEROME KENMAR
DAVIS                                                                    APPELLANT

v.

STATE OF MISSISSIPPI                                                     APPELLEE

DATE OF JUDGMENT:            07/25/2023
TRIAL JUDGE:                 HON. JAMES T. KITCHENS JR.
COURT FROM WHICH APPEALED:   OKTIBBEHA COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:      OFFICE OF STATE PUBLIC DEFENDER
                             BY: HUNTER NOLAN AIKENS
ATTORNEY FOR APPELLEE:       OFFICE OF THE ATTORNEY GENERAL
                             BY: ABBIE EASON KOONCE
DISTRICT ATTORNEY:           SCOTT WINSTON COLOM
NATURE OF THE CASE:          CRIMINAL - FELONY
DISPOSITION:                 AFFIRMED - 06/10/2025
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., LAWRENCE AND EMFINGER, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1.    Following a jury trial, Jerome Davis was convicted of attempted murder for shooting

Kalvin Young with an AR-15 at close range. On appeal, Davis argues that the evidence is

insufficient to support the conviction and that the jury's verdict is contrary to the

overwhelming weight of the evidence. We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.    On the evening of July 27, 2021, Mahlon Robinson hosted twelve to fifteen people

at his Starkville apartment to hang out, play video games, and gamble. Jerome Davis, Kalvin

Young, and several others were shooting dice on a pool table in the living room while other

guests played video games in Robinson's bedroom. Around 10 p.m., Davis and Young had a disagreement about the dice game that ended with Davis shooting Young in the left upper thigh with an AR-15 at close range. Another guest drove Young to the Oktibbeha County Regional Medical Center where doctors determined he had an arterial injury that was causing rapid blood loss. The hospital transferred Young to Jackson to treat his "life-threatening injuries." Young survived the shooting and was released from the hospital the next day.

¶3. Mahlon Robinson testified that he was "not really familiar" with everyone present at his apartment on the night of the shooting. Robinson was in his bedroom playing video games when he heard the shooting in the living room. He waited to be "sure everything was safe" before he left his bedroom. Robinson found Young on the living room floor, bleeding and saying that he had been shot. The police arrived shortly after Young was taken to the hospital, and Robinson gave them footage from two surveillance cameras at his apartment. One camera was pointed directly at the pool table from a wall of the living room, and the other was a doorbell camera at the apartment's front door. Videos from both cameras were admitted into evidence and played for the jury at trial.

¶4. Young testified that he arrived at Robinson's apartment around 9 p.m. and that no more than fifteen people were present. Young shot dice with Davis and several others. At some point, Young rolled the dice, and Davis abruptly picked them up and threw them on the floor. Young and Davis began arguing, and Davis asked Young if he (Young) had a gun. Young told Davis that he did not carry guns. Davis then walked outside and returned immediately holding "a machine gun." Davis pointed the gun at Young and said, "n****,

2

I will bust your shit." Davis then shot Young once in the left upper thigh. Young fell to the ground, while Davis fled. Eventually, another guest took Young to the Oktibbeha County Regional Medical Center emergency room. He was later transported by ambulance to Jackson where he was released from the hospital the following day. Young testified the bullet traveled "from one hip to the other" and broke into "five or six" fragments. At the time of trial, the bullet fragments remained in his body.

¶5.     Dr. Jason Pryor treated Young at the emergency room in Starkville. He testified that Young was suffering from rapid blood loss from the gunshot wound to his left upper thigh. The bullet entered Young's thigh and entered the opposite buttock where it remained lodged inside his pelvis. A CT scan of Young's leg revealed "a life-threatening . . . arterial injury." The CT scan also showed Young had a hematoma "the size of a grapefruit" that "was actively bleeding." Pryor determined that the Starkville hospital "could not handle" Young's injuries and "needed to transfer him to a more specialized center."

¶6.     Pryor described gunshot wounds in the area between the knee and pelvis as life-threatening because the pelvic region and the upper thighs contain major arteries that carry blood throughout the legs. He stated that arterial injuries in this area "bleed very quickly" and "can result in loss of life" if not treated immediately. Pryor testified there was a "very high" chance that Young would have died had he not been transferred to Jackson and that Young was "very lucky to survive."

¶7.     Davis testified that he had known Young "for a long time" from "the neighborhood," but they were not "close friends." Davis said he became angry "[b]ecause [Young] said he

3

was going to take something" from Davis. Davis testified that Young asked him if he had a gun, and Davis responded that he did not need a gun and would "beat [Young] up." Davis then asked Young if he had a gun, and Young "said naw." Davis then went to his car and retrieved his AR-15, which was "fully loaded" with "about 31" rounds. Davis returned to the apartment, pointed the gun at Young, and said, "n****, I will bust this bitch." Davis then shot Young once in the left upper thigh. Davis testified that he intentionally shot Young in the leg and was not trying to kill him. He shot Young "out of anger" and to "prove a point" because Young had insulted him. Davis immediately left the apartment and drove away. Davis claimed that if he had wanted to kill Young, he would have shot him more than once. Davis testified that he was "charged with the wrong charge" and insisted on a trial "because [he] was fighting for an aggravated assault, because [Young] got shot in the leg. And attempted murder is above his waist. Like anywhere about his waist, that's attempted murder. . . . And attempted murder victims, they be in the hospital more than 24 hours."

¶8.     The jury found Davis guilty of attempted murder. The court sentenced him to a term of forty-five years in the custody of the Department of Corrections, with five years suspended and forty years to serve, and five years of post-release supervision. Davis filed a motion for a judgment notwithstanding the verdict or a new trial, which was denied, and a notice of appeal.

**ANALYSIS**

I.     **Sufficiency of the Evidence**

¶9.     Davis first argues there is insufficient evidence to support his attempted murder

conviction. "When this Court reviews the sufficiency of evidence supporting a guilty verdict, we view the evidence in the light most favorable to the State and decide if rational jurors could have found the State proved each element of the crime." *Lenoir v. State*, 222 So. 3d 273, 279 (¶25) (Miss. 2017). "We are not required to decide—*and in fact we must refrain from deciding*—whether *we think* the State proved the elements. Rather, we must decide whether a reasonable juror could rationally say that the State did." *Id.* (citation omitted) (quoting *Poole v. State*, 46 So. 3d 290, 293-94 (¶20) (Miss. 2010)).

¶10. A person is guilty of attempted murder if he "design[s] and endeavor[s] to commit an act which, if accomplished, would constitute an offense of murder . . . but . . . fail[s] therein, or [is] prevented from committing the same." Miss. Code Ann. § 97-1-7(2) (Rev. 2020); *see also Beale v. State*, 367 So. 3d 159, 162-63 (¶¶4, 6) (Miss. 2023) (clarifying that "an overt act is not necessary to prove attempted murder"—"only 'an act' . . . committed in furtherance of the murder"). At Davis's trial, the jury was instructed on the elements of attempted murder and first-degree murder.

¶11. Davis argues there is insufficient evidence to establish beyond a reasonable doubt that he intended to kill Young. Davis further argues that he did not "fail" to kill Young, nor was he "prevented" from doing so. Rather, he argues, he could have killed Young by continuing to shoot him but instead chose to stop and walk away.

¶12. Davis seeks to analogize his case to *Murray v. State*, 403 So. 2d 149 (Miss. 1981). In *Murray*, two inmates at Parchman, Murray and Cathey, seized two corrections officers, held homemade shanks to the officers' throats, and forced the officers to release other

5

inmates. *Id.* at 150-51. However, another inmate urged Murray and Cathey to release the officers, and Murray and Cathey eventually released the officers and gave up their shanks without injuring anyone. *Id.* at 151. Murray was indicted for aggravated assault. *Id.* at 150. At Murray's trial, one of the officers testified that Murray told him "in the beginning that [he] wouldn't be hurt" if he complied with Murray's demands and that Murray never injured him. *Id.* at 151. And Cathey testified he and Murray seized the officers only to bring attention to heating and plumbing problems at the prison. *Id.* Nonetheless, the jury convicted Murray of aggravated assault, which was defined, in relevant part, as an "attempt[] to cause bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm." *Id.* at 152 (ellipsis omitted).

¶13. On appeal, our Supreme Court reversed Murray's conviction, holding that the evidence was insufficient to prove that Murray had "an actual, unequivocal intent . . . to stab this officer" or that any "extraneous events . . . prevented" Murray from stabbing the officer. *Id.* at 152-53. The Court emphasized that Murray "had the means and every opportunity to" harm the officer but still refrained from doing so. *Id.* at 153. For these reasons, the Court concluded that Murray was guilty only of simple assault—for attempting by physical menace to put the officer in fear of serious harm—and remanded for sentencing for that crime. *Id.*

¶14. The present case is readily distinguishable from *Murray*. After confirming that Young was unarmed, Davis went to his car and retrieved a fully loaded high-powered assault rifle. Davis then walked back inside the apartment and shot Young in the leg, resulting in life-threatening injuries to Young. Unlike Murray, Davis inflicted serious bodily injury with a

6

deadly weapon, and the evidence was sufficient for a reasonable juror to rationally find that Davis intended to kill Young.

¶15.    An intent to kill "may be formed very quickly, and perhaps only moments before the act of consummating the intent." *Potts v. State*, 233 So. 3d 782, 791 (¶¶32-33) (Miss. 2017) (quotation marks omitted). "Additionally, where the defendant has not expressed his intent, the only method by which intent may be proven is by showing the acts of the person involved at the time, and by showing the circumstances surrounding the incident." *Id*. (quotation marks omitted). "In many cases, the State is not privy to direct evidence of intent because of the impossibility of peering inside a defendant's mind, but the jury is free to infer intent from the defendant's acts coupled with the surrounding facts and circumstances." *Moffett v. State*, 287 So. 3d 975, 979 (¶14) (Miss. Ct. App. 2019) (quotation marks omitted). Moreover, "an intent to kill . . . may be inferred through the intentional use of any instrument which, based on its manner of use, is calculated to produce death or serious bodily injury." *Brown v. State*, 965 So. 2d 1023, 1030 (¶28) (Miss. 2007).

¶16.    Here, the surrounding circumstances, Davis's own words, and Davis's use of a high-powered assault rifle to shoot Young at close range were sufficient for the jury to find that Davis intended to kill Young. Viewing the evidence in the light most favorable to the State, a reasonable juror could rationally find Davis guilty of attempted murder. Therefore, Davis is not entitled to a judgment of acquittal.

## II.    Weight of the Evidence

¶17.    Davis also argues, in the alternative, that he is entitled to a new trial because the jury's

verdict is against the overwhelming weight of the evidence. For challenges to the weight of the evidence, we "view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017). "We do not reweigh evidence. We do not reassess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Id.* In addition, we "review the trial court's decision to grant or deny a new trial for an abuse of discretion." *Id.* at 292 (¶21).

¶18. In light of all the evidence already discussed above, we cannot say that the jury's verdict was contrary to the overwhelming weight of the evidence. Davis shot Young with an AR-15 at close range, inflicting life-threatening injuries. Further, the jury in this case had the unusual benefit of watching up-close video footage of the crime. Having watched the video and heard the testimony of both Young and Davis himself, the jury found that Davis intended to kill Young and committed the offense of attempted murder. As an appellate court, we do not second-guess the jury by reweighing the evidence or reassessing witnesses' credibility. *Id.* at 289 (¶1). "Those decisions belong solely to the jury." *Id.* Accordingly, because the jury's verdict was not against the overwhelming weight of the evidence, the trial judge did not abuse his discretion by denying Davis's motion for a new trial.

## CONCLUSION

¶19. The State presented sufficient evidence to support Davis's conviction, and the trial judge did not abuse his discretion by denying Davis's motion for a new trial.

8

¶20.   **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND ST. PÉ, JJ., CONCUR.**